IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| HEALTH CREDIT SERVICES, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) COMPLAINT |
| JAMES M. CARUSO, individually and d/b/a JAMES CARUSO MEDICAL CENTER, BRIAN J. VURA, and JTSA ENTERPRISES, LLC, | ) ) JURY TRIAL DEMANDED ) ) ) |
| Defendants. | ) ) |

Plaintiff Health Credit Services, LLC ("HCS" or "Plaintiff"), by and through its undersigned counsel, complains of Defendants James M. Caruso ("James Caruso" or "Dr. Caruso"), Brian J. Vura ("Brian Vura" or "Mr. Vura"), and JTSA Enterprises, LLC ("JTSA"), and alleges as follows:

## NATURE OF THE CASE

1. Defendants perpetrated a fraudulent scheme in which they repeatedly and knowingly submitted false loan applications to Plaintiff on behalf of Dr. Caruso's alleged patients. As a result of the false loan applications, Defendants induced Plaintiff to wrongfully disburse no less than $191,255 to Defendants in loans intended to finance healthcare services purchased by Dr. Caruso's patients from April 6, 2016 to April 26, 2016. Defendants have retained said funds knowing that Plaintiff would not be repaid for the loans that Plaintiff issued in reliance on Defendants' representations. Upon information and belief, Defendants' fraudulent scheme involved the use of (i) loan applications unauthorized by Dr. Caruso's patients, (ii) loan

applications by fictitious patients, (iii) loan applications supported by false underwriting documentation, and (iv) loan applications for fictitious healthcare services.

2. Defendants should not be permitted to profit from their false and intentional misrepresentations. As such, Plaintiff brings this action to recover damages caused by Defendants' contractual breaches, conversion, fraud, racketeering activity, and unfair and deceptive trade practices.

## PARTIES

3. Plaintiff is a North Carolina limited liability company with its principal place of business in Charlotte, North Carolina. Plaintiff's sole member is Credit Services Corporation, LLC ("CSC"), a North Carolina limited liability company with its principal place of business in Charlotte, North Carolina. All of CSC's members are citizens and residents of Charlotte, North Carolina.

4. Upon information and belief, Defendant James Caruso, doing business as James Caruso Medical Center, is a citizen and resident of Will County, Illinois.

5. Upon information and belief, Defendant Brian Vura is a citizen and resident of either Will County, Illinois or DuPage County, Illinois.

6. Upon information and belief, Defendant JTSA is an Arizona limited liability company with its principal place of business in Oro Valley, Arizona. JTSA's sole member is Brian Vura.

7. Upon information and belief, there is complete diversity of citizenship between Plaintiff and Defendants. Plaintiff is a citizen of North Carolina for purposes of diversity jurisdiction while Defendants are citizens of Illinois.

2

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs, and pursuant to 18 U.S.C. § 1964, which gives this Court jurisdiction over federal Racketeer Influenced & Corrupt Organizations Act ("RICO") claims.

9. This Court has personal jurisdiction over Defendants consistent with the principles underlying the U.S. Constitution and N.C. Gen. Stat. § 1-75.4. Defendants engaged in wrongdoing intentionally directed at Plaintiff in North Carolina. In addition, this lawsuit arises out of services performed by Plaintiff for Defendants in North Carolina that was authorized by Defendants.

10. Venue is proper in this Court under the provisions of 28 U.S.C. § 1391. A substantial part of the events giving rise to Plaintiff's claims occurred in this district and division, and Defendants are subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

11. Plaintiff—itself or by and through its affiliates or through relationships with third-party financial institutions—provides healthcare financing through loan origination and portfolio management services to healthcare providers such as Dr. Caruso (the "Healthcare Loan Program"). Under the Healthcare Loan Program, healthcare providers submit loan applications to Plaintiff on behalf of patient-borrowers in order to finance healthcare services purchased by patient-borrowers from the healthcare provider. The loan proceeds are disbursed directly to the healthcare provider to pay for specifically designated healthcare services and the loans are repaid by the patient-borrowers.

12. Upon information and belief, Dr. Caruso is a healthcare provider in the greater Chicago area specializing in cosmetic surgery and doing business as James Caruso Medical Center.

Brian Vura is Dr. Caruso's son-in-law. Mr. Vura, individually, as well as through JTSA, manages Dr. Caruso's medical practice.

13. On March 30, 2016, Dr. Caruso, with the assistance of Mr. Vura, applied for enrollment in Plaintiff's Healthcare Loan Program through one of Plaintiff's sales partners by submitting the following documents:

   a. An enrollment form ("the Enrollment Form," a true and accurate copy of which is attached hereto as <u>Exhibit A</u>);

   b. An executed Master Provider Agreement (the "Agreement," a true and accurate copy of which is attached hereto as <u>Exhibit B</u>);

   c. IRS Form W-9 with Dr. Caruso's Taxpayer Identification Number;

   d. A copy of Dr. Caruso's medical license issued by the State of Illinois;

   e. A voided check; and

   f. A copy of Dr. Caruso's photo identification.

14. After receiving Dr. Caruso's application for enrollment in Plaintiff's Healthcare Loan Program, Plaintiff completed its due diligence and underwriting to process Dr. Caruso's application. Dr. Caruso was enrolled in and became active in Plaintiff's Healthcare Loan Program on April 5, 2016.

**Dr. Caruso's Agreement with Plaintiff**

15. The Agreement governs Dr. Caruso's participation in Plaintiff's Healthcare Loan Program, including Dr. Caruso's obligations, representations, and warranties to Plaintiff.

16. Article 2 of the Agreement sets forth certain obligations of the parties under the Agreement. Among other things, Dr. Caruso agreed:

a. That he "shall only submit to HCS for approval Purchases[1] for Services[2] that have been commenced within thirty (30) days of submission and completed within a reasonable amount of time considering the scope of the Service";

b. That "[i]f, for any reason, a Patient[3] does not receive the Services, or any portion thereof, corresponding to a Purchase . . . then [Dr. Caruso] shall immediately notify HCS, and inform HCS of the credit to be issued to the applicable Patient Account[4]";

c. That Plaintiff may "revoke prior acceptance of funded loans submitted by" Dr. Caruso if "the transaction does not represent a bona fide sale of Services";

d. To "provide data reasonably required by HCS in connection with the [Healthcare Loan Program]"; and

e. To provide Plaintiff with access to Dr. Caruso's books and records during normal business hours upon request.

(Ex. B, §§ 2.5-2.7.)

17. Article 4 of the Agreement sets forth Dr. Caruso's warranties regarding each loan application submitted by Dr. Caruso on behalf of his patients to Plaintiff. Among other things, Dr. Caruso warranted and agreed:

a. "The information, including but not limited to income and employment history, if required, provided to HCS through the use of the Portal is true to the best of [Dr. Caruso's] knowledge and was obtained by [Dr. Caruso] from Patient";

b. "Each Applicant[5] has given [Dr. Caruso] authorization and written consent to obtain a full credit report on behalf of HCS, and each loan application

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement. For convenience, certain definitions from the Agreement are provided here. A "Purchase" is defined as "[a] purchase by a Patient of Services from [Caruso] that is financed through a Patient Account, whether designated as an Initial Purchase or Additional Purchase."

[2] "Services" are defined as "services to individual patients that are customarily provided by Providers in their line of business together with related medical equipment and/or appliances."

[3] A "Patient" is defined as "[t]he individual in whose name a Patient Account is established for Services to be provided to that individual or that individual's designee."

[4] A "Patient Account" is defined as "[t]he credit agreement between or on behalf of a Patient or responsible party and HCS or Lender for the financing of Services provided to a Patient."

[5] An "Applicant" is defined as "[a] Patient or responsible party who has completed an Application for a Patient Account."

<ul>
<li style="list-style: none;">
<ul>
<li style="list-style: none;">
was actually signed, in print or electronically, by the Applicant named therein as purchaser or responsible party and accurately reflects a genuine transaction between [Dr. Caruso] and Applicant in all particulars, including but not limited to verification of the Applicant's identity . . .";
</li>
</ul>
</li>
<li>"Purchaser has accepted the Services or the program of Services described in the loan and . . . Purchases included in the Patient Account are solely charges for Services at rates agreed with the Patient";</li>
<li>"[Dr. Caruso] has not knowingly communicated to HCS incorrect information relating to the borrower's Application or knowingly failed to communicate to HCS information relating to such Application or credit statement";</li>
<li>"[Dr. Caruso] has not colluded with Patient and all Applications and Services are made on a third party, arm's length basis and no member of [Dr. Caruso's] staff or any of their immediate family members have or will submit Applications"; and</li>
<li>"No misrepresentation, fraud or misstatement of any material fact by [Dr. Caruso] or [Dr. Caruso's] staff contained in or relating to any loan or any other misrepresentation or breach of warranty has occurred."</li>
</ul>

(*Id.* § 4.1.)

18. In Section 4.2 of the Agreement, Dr. Caruso agreed that if any of the warranties in Section 4.1 were breached or proven to be false with respect to any Patient Account, then Dr. Caruso would "upon the request of HCS, purchase the affected Patient Account from HCS within five (5) business days after such request, whether or not the loan is then in default, for the full unpaid balance of principal plus $50 per loan account (such an amount, a "Chargeback"), and shall reimburse HCS and Lender for all reasonable fees and expenses arising from such breach or related to such Patient Account."

19. Dr. Caruso also agreed that he "shall not be entitled to retain any Funded Amounts received as a result of fraudulent activity attributable to [Dr. Caruso], [his] employees or agents." (*Id.*, § 5.1.) Instead, the Agreement requires Dr. Caruso to "refund, return or pay, as the case may be, any such Funded Amounts to HCS together with accrued and billed interest and finance charges

there on" and "reimburse HCS for all reasonable fees and expenses, processing, servicing and collection costs . . . arising from such breach or related to such Patient Account." (*Id.* § 5.1.)

20. In Section 5.2 of the Agreement, Dr. Caruso agreed to permit "HCS to withdraw through an ACH or similar process, funds from an account in [Dr. Caruso's] name for any amounts due to HCS" and further agreed to "ensure that, in [Dr. Caruso's] account, there are sufficient funds to compensate for any and all credits, reversals, returns and other matters that [Dr. Caruso] is obligated to pay HCS as provided herein." (*Id.* § 5.2.) The Agreement further provides that interest on due but unpaid amounts accrues at 1.5% per month until paid, or the maximum amount permitted by North Carolina law, if a lesser amount. (*Id.*)

21. The Agreement defines an "event of default" as, among other things, the material breach of any representation, warranty, promise, guaranty, agreement or statement by Dr. Caruso to HCS. (*Id.* § 6.1(b).) Upon an event of default, all amounts owed by Caruso to HCS become immediately due and payable without any notice to Dr. Caruso. (*Id.* § 6.2.)

22. Dr. Caruso further agreed to "indemnif[y] and hold[] harmless HCS . . . from any and all damages, losses, suits, claims, actions, costs or expenses, including attorney fees and court costs, relating to any claim, cause of action or liability of any kind whatsoever arising from . . . any representations or promises made by [Dr. Caruso], its employees or agents in connection with the Services . . . and the making of any loans to prospective Borrowers referred by [Dr. Caruso] to HCS, or any breach by [Dr. Caruso] of any promised representation, warranty, or agreement [he] has made herein or of any term or provision hereof . . . ." (*Id.* § 10.1.)

**Defendants' Fraudulent Scheme**

23. Under the Healthcare Loan Program, a healthcare provider such as Dr. Caruso submits loan applications to Plaintiff on behalf of patient-borrowers seeking financing for

healthcare services purchased by patient-borrowers from the healthcare provider. If a patient-borrower's application is approved, Plaintiff establishes a Patient Account and funds a loan for the healthcare services designated in the loan application. The proceeds of the loan are disbursed directly to the healthcare provider for payment of the designated healthcare services in accordance with the terms of an agreement substantially similar to the Agreement. The loans are repaid by the patient-borrowers.

24. Immediately after enrollment in Plaintiff's Healthcare Loan Program, Dr. Caruso, or Mr. Vura on Dr. Caruso's behalf, submitted multiple loan applications to Plaintiff on behalf of Dr. Caruso's purported patient-borrowers.

25. Between April 6, 2016 and April 26, 2016, Plaintiff funded at least twelve loans totaling no less than $191,255.00 in reliance on the loan applications submitted to Plaintiff by Defendants.

26. Upon information and belief, the loan applications that Dr. Caruso and/or Mr. Vura submitted to Plaintiff contained false information and were not otherwise in compliance with Dr. Caruso's representations and warranties under the Agreement.

27. Upon information and belief, Dr. Caruso and Mr. Vura knowingly submitted the loan applications containing false information to Plaintiff in order to wrongfully induce Plaintiff to disburse the proceeds of approved loan applications to Defendants. The loan applications were false and misleading because they were (i) unauthorized by Dr. Caruso's patients, (ii) submitted on behalf of fictitious patients, (iii) supported by false underwriting documentation, and/or (iv) submitted for financing of fictitious healthcare services.

28. Upon information and belief, Defendants did not use, and did not intend to use, the funds that Plaintiff transferred to Defendants for the healthcare services for which the loans were designated and authorized.

29. Upon information and belief, Defendants submitted fraudulent applications in order to induce Plaintiff to transfer funds to Defendants for their own personal use and not for any purpose for which the funds were authorized.

30. While Dr. Caruso was enrolled in the Healthcare Loan Program and Defendants were submitting fraudulent applications to Plaintiff, Plaintiff identified numerous concerns with the loan applications submitted by Defendants to Plaintiff on behalf of Dr. Caruso's purported patients.

31. By way of example, upon an aggregate analysis of loan applications submitted by Defendants, Plaintiff identified that all of Dr. Caruso's patient-borrowers were located in various states such as California, Nevada, South Carolina, and Georgia—states all outside the home state of Dr. Caruso's medical practice, Illinois.

32. Plaintiff's analysis also revealed that all of Dr. Caruso's purported patient-borrowers had minimal credit histories that were established recently in the past few years. Plaintiff was further unable to verify other personal information submitted by Dr. Caruso's purported patient-borrowers, including social security numbers.

33. After identifying concerns with the loan applications submitted by Defendants, Plaintiff attempted to contact Dr. Caruso and obtain additional information, consistent with Dr. Caruso's obligations under the Agreement. Plaintiff, however, was only able to get in touch with Brian Vura, who represented that he was Dr. Caruso's office manager and son-in-law. Mr. Vura refused Plaintiff's requests to speak directly with Dr. Caruso.

34. When questioned about Plaintiff's concerns with loan applications submitted by Defendants to Plaintiff, Mr. Vura, upon information and belief, provided Plaintiff with additional false representations in an attempt to conceal Defendants' fraud. For example, Mr. Vura falsely represented that Dr. Caruso was a renowned surgeon and receives referrals from across the country, hence the reason for the diverse geographic background of Dr. Caruso's purported patient-borrowers. Upon information and belief, Dr. Caruso is not a renowned surgeon and does not receive referrals nationwide, as represented by Mr. Vura. Instead, Mr. Vura falsely represented the nature of Dr. Caruso's practice in order to induce Plaintiff to continue accepting applications, approving loans, and transferring funds to Defendants in perpetration of their fraudulent scheme.

35. Mr. Vura also represented that the loan proceeds were used to pay for healthcare services provided prior to submission of the loan applications. The Agreement, however, prohibits Dr. Caruso from applying the loan proceeds to payment for services for which the patient-borrower is in arrears.

36. Despite Mr. Vura's assurances, Plaintiff thereafter continued to identify various concerns with loan applications submitted by Defendants on behalf of Dr. Caruso's purported patients. Most notably, the loan applications for three of Dr. Caruso's purported patient-borrowers listed the same residential address, which also happens to be Dr. Caruso's home address.

37. As a result of Dr. Caruso's breach of his obligations and representations under the Agreement, Plaintiff terminated its relationship with Dr. Caruso on April 26, 2016—less than one month after Dr. Caruso's enrollment in the Healthcare Loan Program.

38. Thereafter, on June 23, 2016, Plaintiff received an industry notice confirming Plaintiff's suspicions regarding Defendants' course and conduct in submitting fraudulent loan applications. A true and accurate copy of the notice is attached hereto as Exhibit C.

10
Case 3:17-cv-00703-RJC-DCK    Document 1    Filed 12/05/17    Page 10 of 17

39. Despite demand to Defendants, Plaintiff has unsuccessfully attempted to recover all loan proceeds wrongfully disbursed to Defendants to no avail. Instead, after termination of Dr. Caruso's participation in the Healthcare Loan Program, Mr. Vura, individually and on behalf of Dr. Caruso and JTSA, has continued to represent to Plaintiff that Defendants would repay to Plaintiff the unpaid balance, or a portion thereof, of the outstanding loans that Plaintiff funded in reliance on loan applications submitted by Defendants on behalf of Dr. Caruso's purported patients. Defendants, however, have failed to make any payment to Plaintiff. Upon information and belief, Mr. Vura represented Defendants would pay Plaintiff in order to forestall Plaintiff's exercise of its contractual, common-law, and statutory rights.

40. Upon information and belief, at all times relevant to this action, Dr. Caruso and Mr. Vura acted in concert with respect to the wrongdoing alleged herein.

## First Claim for Relief
### (Breach of Contract Against Dr. Caruso)

41. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

42. Pursuant to the Agreement, Dr. Caruso made representations and warranties to Plaintiff and assumed certain obligations as described herein and set forth more fully in Exhibit 2, thereby causing Plaintiff to disburse no less than $191,255 in loan proceeds to Defendants.

43. Plaintiff has fully performed its obligations under the Agreement with Dr. Caruso.

44. Dr. Caruso has materially breached its representations and warranties and obligations and defaulted under the Agreement by, *inter alia*:

    a. Knowingly submitting loan applications containing inaccurate and/or false information;

    b. Submitting loan applications that did not accurately reflect a genuine transaction between Dr. Caruso and his purported patient-borrowers;

c. Submitting applications or accepting payments where Dr. Caruso's purported patient-borrowers had not accepted the Services or the program of Services described in the loan applications submitted to Plaintiff;

d. Submitting for approval Purchases of Services, and accepting payments for Purchases of Services, where such Services had not been commenced within thirty (30) days of submission and completed within a reasonable amount of time;

e. Failing to notify Plaintiff and issue credits to Patient Accounts where patient-borrowers did not receive the Services, or any portion thereof, corresponding to a Purchase or Patient Account;

f. Failing to purchase Patient Accounts with respect to which there had been a breach of a representation and warranty in Section 4.1 of the Agreement for the full unpaid balance of principal plus $50 per loan account and to reimburse Plaintiff for all reasonable fees and expenses arising from such breach or related to such Patient Accounts;

g. Failing to permit Plaintiff to debit the bank account provided by Dr. Caruso for Chargebacks;

h. Failing to repay Plaintiff amounts corresponding to Reversed Amounts or Chargebacks;

i. Retaining Funded Amounts received as a result of fraudulent activity attributable to Dr. Caruso and his employees or agents (Mr. Vura and JTSA); and

j. Failing to indemnify Plaintiff from damages arising from Dr. Caruso's breaches of his representations, warranties, and obligations under the Agreement.

45. As a direct and proximate result of Dr. Caruso's breaches, Plaintiff has been damaged and is entitled to recover damages in an amount to be determined at trial.

### Second Cause of Action
**(Conversion Against All Defendants)**

46. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

47. Defendants obtained Plaintiff's funds for their own profit and benefit in violation of their contractual, common law, and statutory duties.

48. Defendants retained Plaintiff's funds without authorization or informed consent from Plaintiff.

49. Defendants converted Plaintiff's funds for their own use and to the exclusion of the rights of Plaintiff, thereby injuring Plaintiff in the amount of the improperly and impermissibly obtained funds, plus interest.

50. Defendants' taking and use of Plaintiff's funds was willful, intentional, malicious and without regard to the rights of Plaintiff.

51. Defendants' unauthorized and impermissible use of Plaintiff's funds was accomplished recklessly and with conscious indifference to the rights of Plaintiff.

52. Defendants' unauthorized and impermissible use of Plaintiff's funds deprived Plaintiff of the use of its funds, was wrongful, and constitutes conversion.

53. As a direct and proximate result of Defendants' conversion, Plaintiff is entitled to damages to be proven at trial.

### Third Cause of Action
**(Fraud Against All Defendants)**

54. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

55. Defendants created and carried out a scheme to defraud Plaintiff with the intent to deceive by continuously submitting loan applications containing false information in order to wrongfully induce Plaintiff to disburse the proceeds of approved loan applications to Defendants.

56. In submitting the loan applications at issue to Plaintiff, Defendants were representing that the loan applications were authorized by the respective patient-borrowers, were genuine, and arose from a bona fide sales of services to the patient-borrowers.

57. After termination of Dr. Caruso's participation in the Healthcare Loan Program, Mr. Vura—on behalf of himself, Mr. Caruso, and JTSA—further provided additional misrepresentations as described above in order to induce Plaintiff to refrain from exercising its contractual, common law, and statutory rights.

58. At the time when the false representations were made, Defendants were aware of the falsity of the representations and intended for Plaintiff to rely upon them.

59. At the time when the false representations were made, Plaintiff had no knowledge of the falsity of the representations, Plaintiff reasonably relied upon the false representations, and Plaintiff had a right to rely on the false representations.

60. Defendants had a pecuniary interest in making the false representations to Plaintiff because the false representations enabled Defendants to wrongfully obtain funds.

61. Defendants conduct was willful, fraudulent, and specifically intended to deceive and harm Plaintiff.

62. As a direct and proximate cause of Defendants' fraud, Plaintiff has suffered damages in an amount to be proven at trial.

**Fourth Cause of Action**
**(RICO Against All Defendants)**

63. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

64. Defendants' actions, as described above, constitute RICO violations.

65. Each Defendant is a "person" as that term is defined in Section 1961(3) of RICO.

66. Defendants constituted an "enterprise" as that term is defined in Section 1961(4) of RICO, which such enterprise is engaged in and whose activities affect interstate commerce.

67. Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiff. Defendants' pattern of racketeering activity included no less than twelve distinct instances between April 6, 2016 and April 26, 2016 in which Defendants submitted fraudulent loan applications through Plaintiff's application processing system and received funds in reliance on such application through interstate wires.

68. As described above, Defendants were engaged in a pattern of illegal activity constituting multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

69. As a direct and proximate result of Defendants' violation of RICO, Plaintiff has been injured in its business and property. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action and to recover treble damages in an amount to be proved at trial, and its reasonable attorneys' fees and costs.

**Fifth Cause of Action**
**(Unfair and Deceptive Trade Practices Against All Defendants)**

70. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

71. Defendants' actions, as described above, constitute unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1, *et seq.*

72. Defendants willfully and knowingly perpetrated a scheme in which they submitted loan applications containing false information in order to induce Plaintiff to approve and fund loans and pay Defendants for services that were not rendered as represented.

73. Defendants' acts, which were in and affecting commerce within the State of North Carolina, are unfair, deceptive, unethical, unscrupulous, and substantially injurious to Plaintiff.

74. Plaintiff has been damaged by Defendants' unfair and deceptive trade practices and are entitled to relief pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1. Plaintiff is entitled to compensatory damages, which should be trebled, and to costs and attorneys' fees as determined by the Court.

### Sixth Cause of Action
**(Conspiracy Against All Defendants)**

75. Plaintiff reallege and incorporate the preceding paragraphs as if fully set forth herein.

76. Upon information and belief, Defendants agreed between themselves by words and actions known to them to do unlawful acts, including without limitation the acts described above.

77. Upon information and belief, Defendants agreed between themselves by words and actions known to them to do lawful acts in an unlawful way, including without limitation the acts described above.

78. Upon information and belief, Defendants, as conspirators in this civil conspiracy, are individually liable to Plaintiff for the acts of any of them done in furtherance of their agreement.

79. The actions performed in furtherance of Defendants' agreement have caused Plaintiff damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff requests that:

1. The Court enter judgment against Dr. Caruso on Plaintiff's breach of contract claim in an amount to be proven at trial, plus interest at the legal rate until and after judgment;

2. The Court enter judgment against all Defendants, jointly and severally, on Plaintiff's conversion, fraud, RICO, unfair and deceptive trade practices, and conspiracy claims in an amount to be proven at trial, plus interest at the legal rate until and after judgment;

3. The Court award Plaintiff treble damages pursuant to 18 U.S.C. § 1964(c) and N.C. Gen. Stat. § 75-16;

4. The Court award Plaintiff its costs and expenses, including attorneys' fees, pursuant to the Agreement, 18 U.S.C. § 1964(c), and N.C. Gen. Stat. § 75-16.1; and

5. The Court award Plaintiff such other and further relief as it deems just and proper.

This the 5th day of December, 2017.

> BY: s/ Mark A. Nebrig
> MOORE & VAN ALLEN PLLC
> Mark A. Nebrig
> N.C. Bar No. 28710
> Nader S. Raja
> N.C. Bar No. 41540
> 100 N. Tryon Street, Suite 4700
> Charlotte, North Carolina 28202
> Telephone: 704-331-1000
> Facsimile: 704-339-5895
> marknebrig@mvalaw.com
> naderraja@mvalaw.com
>
> ATTORNEYS FOR PLAINTIFF